IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| SHANNON E. WHITE, on behalf of herself and of all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | Civil Action No. _____ |
| v. | ) ) ) | |
| CAPITAL RECOVERY SOLUTIONS, LLC d/b/a NATIONAL FINANCIAL SERVICES GROUP a/k/a CAPITAL SOLUTIONS a/k/a CAPITAL LITIGATION a/k/a CAPITAL MEDIATION a/k/a NATIONAL LITIGATION; UNITED COLLECTIONS RECOVERY, LLC a/k/a UNITED CR; NATIONAL LANDMARK SERVICES OF UNITED RECOVERY, LLC A/K/A LANDMARK LEGAL; CREDITORS SOLUTION SERVICES, LLC; AMERICAN CREDIT SERVICES, LLC a/k/a ACS GROUP; CHARLES LAMAR LOCKWOOD III; SHAWN MICHAEL BURE; JEAN-PIERRE CELLENT; LASHONE ELAM a/k/a LASHONE CALDWELL; FRANK MCBRIDE; AMWAY FINANCIAL SERVICES GROUP, LLC; CLL3 CONSULTING, LLC; OPEN COLLECT, LLC, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **CLASS ACTION COMPLAINT AND JURY DEMAND** |
| Defendants. | ) | |

## CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Shannon E. White ("Plaintiff"), on behalf of herself and of all others similarly situated, by and through her undersigned counsel, alleges, on knowledge as to herself and on information and belief as to all other matters, as follows:

**Introduction**

1.     This is a putative class action by an individual named consumer for injunctive relief and damages stemming from the defendants' violations of the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et seq.* ("FDCPA"), which prohibits debt collectors from engaging in unfair, deceptive, or abusive practices in collecting consumer debts; and the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.* ("RICO Act"), which prohibits any person from participating in the conduct of an enterprise in interstate commerce through the collection of unlawful debt.  Here, the Defendants have participated for years in an unlawful Enterprise whose purpose is to purchase and collect portfolios of "payday loans" in which the asserted interest rate is far more than double the maximum legally enforceable rate in New York.  The loans are therefore void and unenforceable and constitute "unlawful debt" as defined in the RICO Act.  The Enterprise attempts to collect this "unlawful debt" by placing phone calls to New York consumers.  Each such phone call is a felony under the New York Penal Law.  In addition, to protect itself against consumer complaints and law enforcement action, the Enterprise creates a series of shell companies that place collection calls and process the resulting payments for a brief time and then seemingly go out of business, transferring operations to ostensibly new companies operating with the same collectors from the same locations; all the while systematically extorting payments from consumers by deceptively claiming to be collecting legitimate debts and, indeed, deceptively representing to consumers that the consumer's failure to pay will result in his or her being imprisoned or sued.

2.     The operation of the Enterprise is illustrated by the experience of Plaintiff Shannon E. White here.  Desperate for cash to meet short-term personal emergency needs and with few options available, Ms. White submitted loan applications at Internet payday lending

websites that advertised to New York consumers. Ms. White assumed that the loans must be

lawful, enforceable, and legitimate because otherwise the lenders would not be catering to New

York consumers, and did not understand the extortionate financial reality of the loans, the terms

of which are not disclosed until the application is already approved or even, in some cases, after

the loan has already been made. Among the lenders that provided Ms. White with loans upon

submission of these applications were nonparties OPD Solutions, CP Investors, and Vince

Enterprises. After she defaulted on those entities' loans, the entities sold the accounts to

members of the Enterprise, which assigned Defendants Capital Recovery Solutions, United CR,

Creditors, and Landmark to collect them.

3.      Defendant Capital Recovery Solutions placed phone calls to Ms. White in

which its debt collectors stated that her only options with respect to the loans from OPD

Solutions and CP Investors were either to be brought up on "fraud" charges by the FDIC, or

make immediate payment over the phone. Believing these deceptive statements about potential

criminal liability if she failed to pay, Ms. White authorized payment by debit card and incurred a

initial charge of $282 and further subsequent charges. In reality, however, the loan was void and

unenforceable, and could not be collected in New York by civil or any other means, and the mere

placing of phone calls to collect it by Defendant Capital was, without more, a felony in violation

of the New York Penal Law.

4.      Defendant United CR placed phone calls to Ms. White in which its debt

collectors stated that payday loans were perfectly legal in New York and that to avoid being sued

concerning the Vince Enterprises loan, she would have to make payment over the phone.

Believing these deceptive statements about the potential consequences of failure to pay, Ms.

White authorized payment by debit card and incurred a charge of $200. In reality, however, the

loan was void and unenforceable, and could not be collected in New York by civil or any other means, and the mere placing of phone calls to collect it by Defendant Capital was, without more, a felony in violation of the New York Penal Law.

5.      Defendants Creditors and Landmark each also placed phone calls to Ms. White and to Ms. White's parents, in an effort to collect payday loans.

6.      All these companies and their continuations or alter egos, including Defendant ACS, are run by Defendants Lockwood and Bure out of offices in Chandler, Arizona, Fort Mill and Rock Hill, South Carolina, and Charlotte, North Carolina.  The business supports several large call centers in the Charlotte and Fort Mill areas employing well over one hundred individual debt collector employees, generating millions of dollars in annual revenue.  The business has been so lucrative for its principals that one of them, Defendant Lockwood, recently used the proceeds to purchase a million dollar house in Matthews, North Carolina.

7.      Because the Enterprise's collection contacts with New Yorkers are all unlawful in violation of RICO, and because the Enterprise systematically deceives New York consumers and violates their FDCPA rights, Ms. White brings this action on behalf of putative classes of all consumers in New York who have received collection contacts from, or made payments to, the Defendants.

## Jurisdiction and Venue

8.      This Court has subject matter jurisdiction over Plaintiffs' federal claims under 15 U.S.C. § 1692k(d), 18 U.S.C. §1964, and 28 U.S.C. § 1331.

9.      Venue is proper in this district under 18 U.S.C. § 1965 and 28 U.S.C. § 1391(b) because the Defendants transact business here and the conduct complained of occurred here.

## Parties

10.     Plaintiff Shannon E. White is a natural person domiciled in the City of Buffalo, County of Erie, and State of New York, and is a "consumer" as that term is defined by 15 U.S.C. § 1692a(3).

11.     Defendant Capital Recovery Solutions, LLC ("Capital") is a limited liability company organized and existing beginning in March 2010 under the laws of the State of Arizona and registered to do business beginning in July 2010 in the State of North Carolina, operating until June 2013 out of offices at Quorum Business Park, 7500 E. Independence Blvd., Suite 101, Charlotte, North Carolina, and receiving mail at 2925 E. Riggs Road, Suite 8-232 and Suite 8-230, Chandler, Arizona (mailboxes in a PostNet Business Center located at 2925 E. Riggs Road, Suite 8, Chandler, Arizona), whose existence terminated in June 2013 with the filing of articles of dissolution in Arizona. Defendant Capital filed in October 2011 a fictitious name registration in the State of Arizona under the name "National Financial Services Group." Defendant Capital was in the business of collecting payday loans from consumers throughout the United States. Defendant Capital's day to day operations were managed by Defendants Cellent, Lockwood, and McBride. In its contacts with consumers, Defendant Capital has routinely stated that its name is "Capital," "Capital Solutions," "Capital Litigation," "National," or "National Litigation." Upon its dissolution Defendant Capital transferred its operations to Defendant Landmark.

12.     Defendant Capital regularly attempts to collect debts alleged to be due another, through communications by phone, and so is and has at all times pertinent hereto been a "debt collector" as that term is defined by 15 U.S.C. § 1692a(6).

13.     Defendant United Collections Recovery, LLC ("United CR") is a limited liability company organized and existing since October 2012 under the laws of the State of Delaware and registered to do business since November 2012 in the State of North Carolina, believed to be operating out of offices at 200 Regency Executive Park Blvd, Charlotte, North Carolina, and receiving mail at 1750 Highway 160 West Suite 101 #137, Fort Mill, South Carolina (a UPS store mailbox in a strip mall).  Defendant United CR's day to day operations are managed by Defendants Lockwood and McBride.  Defendant United CR is in the business of collecting payday loans from consumers throughout the United States.

14.     Defendant United CR regularly attempts to collect debts alleged to be due another, through communications by phone, and so is and has at all times pertinent hereto been a "debt collector" as that term is defined by 15 U.S.C. § 1692a(6).

15.     Defendant Creditors Solution Services, LLC ("Creditors") is a limited liability company organized and existing since July 2012 under the laws of the State of Delaware, and receiving mail at 1750 Highway 160 West Suite 101 #127, Fort Mill, South Carolina (a UPS store mailbox in a strip mall).  Between 2012 and 2013 it operated out of offices at the Mallard Creek Center, 8520 Cliff Cameron Drive, Suite 200, Charlotte, North Carolina, shared with Defendant ACS Group.  It serves as an alter ego of that company, which is now located at 200 Regency Executive Park Blvd, Suite 200, Charlotte, North Carolina.  Defendant Creditors's day to day operations are managed by Defendants Elam and Lockwood.  Defendant Creditors is in the business of collecting payday loans from consumers throughout the United States.

16.     Defendant Creditors regularly attempts to collect debts alleged to be due another, through communications by phone, and so is and has at all times pertinent hereto been a "debt collector" as that term is defined by 15 U.S.C. § 1692a(6).

17.     Defendant National Landmark Services of United Recovery, LLC ("Landmark") is a limited liability company organized and existing since January 2012 under the laws of the State of Ohio, which operates out of offices located at Quorum Business Park, 7500 E. Independence Blvd., Suite 101, Charlotte, North Carolina, and until late 2012 operated from offices at Harris Ridge, 6125 Lakeview Road, Suite 100, Charlotte, North Carolina. Defendant Landmark is the successor of Defendant Capital, having taken over its offices and employees. Defendant Landmark's day to day operations are managed by Defendants Cellent, Lockwood, and McBride. Defendant Landmark is in the business of collecting payday loans from consumers throughout the United States. Defendant Landmark routinely identifies itself to consumers as "Landmark Legal," as "National," or as "United."

18.     Defendant Landmark regularly attempts to collect debts alleged to be due another, through communications by phone, and so is and has at all times pertinent hereto been a "debt collector" as that term is defined by 15 U.S.C. § 1692a(6).

19.     Defendant American Credit Services, LLC ("ACS Group") is a limited liability company organized and existing since May 2012 under the laws of the State of Wyoming, and registered to do business in a number of other states. Between 2012 and 2013 Defendant ACS Group operated out of offices at the Mallard Creek Center, 8520 Cliff Cameron Drive, Suite 200, Charlotte, North Carolina, shared with Defendant Creditors. It now operates out of offices located at 200 Regency Executive Park Blvd., Suite 200, Charlotte, North Carolina, which offices are shared with Defendants Creditors and United CR, and a number of

nonparty debt collection companies; and receives mail at PO Box 681784, Charlotte, North

Carolina 28216.  Defendant ACS Group's day to day operations are managed by Defendants

Lockwood and Elam.  Defendant ACS Group is in the business of collecting payday loans from

consumers throughout the United States.

20.     Defendant ACS Group regularly attempts to collect debts alleged to be

due another, through communications by phone, and so is and has at all times pertinent hereto

been a "debt collector" as that term is defined by 15 U.S.C. § 1692a(6).

21.     Defendants Capital, United CR, Creditors, ACS, and Landmark, are

collectively referred to herein as the "Debt Collector Defendants."

22.     Defendant Amway Financial Services Group, LLC ("Amway") is a limited

liability company organized and existing since April 2012 under the laws of the State of

Delaware, which operates out of offices located at 200 Regency Executive Park Blvd, Charlotte,

North Carolina.  Defendant Amway is owned and operated by Defendant Lockwood.  Defendant

Amway is in the business of purchasing, collecting, and placing for collection with related

companies that it supervises payday loans from consumers throughout the United States.

23.     Defendant Amway regularly attempts to collect debts alleged to be due

another or debts acquired by assignment after default, through communications by phone, and so

is and has at all times pertinent hereto been a "debt collector" as that term is defined by 15 U.S.C.

§ 1692a(6).

24.     Defendant CLL3 Consulting, LLC ("CLL3") is a limited liability company

organized and existing since May 2009 under the laws of the State of Arizona, which operates

out of offices located at 200 Regency Executive Park Blvd, Charlotte, North Carolina, and

receives mail at Defendant Bure's residence in Chandler, Arizona.  Defendant CLL3 is in the

business of providing outsourced management services to payday loan debt buyers and collectors. Defendant CLL3 is wholly owned, managed, and operated by Defendant Lockwood.

25.     Defendant Open Collect LLC ("Open Collect") is a limited liability company organized and existing since June 2010 under the laws of the State of Arizona, which until recently operated out of offices located at 1711 W. Greentree Dr. Suite 225, Tempe, Arizona. Defendant Open Collect is in the business of providing payment processing software and services to payday loan debt collectors including the Debt Collector Defendants. Defendant Open Collect is wholly owned, managed, and operated by Defendant Bure.

26.     Defendants Amway, CLL3, and Open Collect are referred to collectively herein as the Consulting Defendants.

27.     Defendant Charles Lamar Lockwood, III is a natural person residing in Matthews, North Carolina. Defendant Lockwood serves as day to day manager of the Debt Collector Defendants and, either personally or through his consulting firms, Defendants Amway and CLL3, controls the largest financial interest in each Debt Collector Defendant.

28.     Defendant Shawn Michael Bure is a natural person domiciled in Gilbert, Arizona and is a business partner of Defendant Lockwood in numerous debt collection companies including several of the Debt Collector Defendants. Defendant Bure, through his consulting firm, Defendant Open Collect, provides anonymous payment processing services to the Debt Collector Defendants.

29.     Defendant Jean-Pierre Cellent is a natural person residing in Fort Mill, South Carolina, and is an Evangelist of the Charlotte Immanuel Church of All Nations. Defendant Cellent is President and day-to-day manager of Defendants Capital and Landmark, and a business partner of Defendant Lockwood. Defendant Cellent also serves as Vice President

of nonparty Avalanche International Ministries, Inc., a not-for-profit corporation founded by Defendant Lockwood's sister Mary Bivin; and co-founder and incorporator with Defendant McBride of nonparty not-for-profit corporation United Missions, Inc.

30.     Defendant Lashone Elam is a natural person residing in Charlotte, North Carolina, is a business partner of Defendant Lockwood, and is part owner and day to day manager of Defendants ACS and Creditors.  Ms. Elam also uses the name Lashone Caldwell.

31.     Defendant Frank McBride is a natural person residing in the Charlotte, North Carolina metropolitan area, and is an Elder of the Fort Mill Church of God.  Defendant McBride serves as Human Resources Director of Defendants Capital, United CR, and Landmark, and a business partner of Defendants Cellent and Lockwood.  Through his not-for-profit corporation, nonparty Global Freedom Inc., Defendant McBride owns the websites for, and provides Internet registration services to, Defendants Capital, United CR, Creditors, ACS, and Landmark, and to a number of other debt collection companies created by the Individual Defendants.

32.     Defendants Lockwood, Bure, Cellent, Elam, and McBride are referred to collectively herein as the Individual Defendants.

33.     The acts of the Debt Collector Defendants and Consulting Defendants alleged hereinafter were performed by their respective employees acting within the scope of their actual or apparent authority.

34.     All references to a Debt Collector Defendant or Consulting Defendant herein shall mean the respective entity or an employee thereof.

## Legal and Regulatory Background

35.     New York usury laws provide a general maximum interest rate of 16%, and provide that any loan made in excess of that maximum rate, unless made by a savings bank, savings and loan association, or federal savings and loan association, is void and unenforceable in its entirety as to both interest and principal.  N.Y. General Obligation Law §§ 5-501(1)-(2), 5-511; N.Y. Banking Law § 14-a.

36.     New York's usury laws further provide that it is an E Felony to knowingly collect in excess of 25% interest for a loan in the State of New York, and a C Felony to do so as part of a business whose purpose is to make such loans.  N.Y. Penal Law §§ 190.40, 190.42.

37.     New York's Licensed Lender Law permits New York licensed lenders to make loans in excess of these limits, provided the loan is for less than $25,000 and made for personal, family, household, or investment purposes.  However, it is a misdemeanor to make a loan in the State of New York in excess of the 16% general usury limit without having first obtained such a license from the New York State Banking Department.  N.Y. Banking Law §§ 340, 358.

## The Enterprise

38.     Defendants Lockwood and Bure each grew up and attended high school in the Town of Angola, County of Erie, State of New York, attending Lake Shore Central High School in the early 1990s.  Defendants were friends in high school and were each friends with nonparty Christopher J. Collins, another alumnus of Lake Shore.

39.     After high school, Defendants and nonparty Collins pursued various business ventures together in the Buffalo area.  Thereafter, Defendant Bure moved to Chandler,

Arizona and Defendant Lockwood moved to Charlotte, North Carolina, where both continued to found and attempt to build small businesses.

40.     Between 2004 and 2008, nonparty Collins worked as a licensed debt collector for agencies in the Buffalo area.  Beginning in or around early 2008, Defendant Lockwood worked as a licensed collections agent for national mega-collector NCO Financial in the Charlotte area.

41.     On information and belief, Defendants Bure and Lockwood and nonparty Collins, based on their experience working in debt collection, developed during 2008 a business model wherein they would purchase a large volume of very cheap debt and attempt to collect that debt at minimal cost by making phone calls in which the consumer would be encouraged to make immediate payment without requiring any paper communication such as debt verification. Because the cheapest debt available for purchase was payday loans, the model focused on purchasing and collecting payday loans.

42.     Accordingly, and in furtherance of this vision, Defendants Bure and Lockwood and nonparty Collins founded the "BAM Group" companies consisting of Bayside Asset Management, LLC, and Bayside Asset Recovery, LLC, each of which was organized as an Arizona limited liability company in September 2008 with Defendants Bure and Lockwood and nonparty Collins as members/managers.

43.     For the next several years, the BAM Group companies purchased and collected portfolios of payday loans by placing phone calls to consumers in which the companies' collection agents systematically deceived consumers into believing that failure to pay a payday loan would result in prompt imprisonment or service of a civil lawsuit, when in reality such consumers were never sued and were not subject to arrest.  The purpose of this "high-

pressure" approach was to encourage immediate payment over the phone and thus keep down costs by minimizing the need to make paper mailings or to spend time on additional phone calls. The companies also as a matter of routine provided fake addresses to consumers, or refused to provide addresses, in order to prevent the filing of consumer complaints.

44.     The BAM Group companies were very successful, growing from a handful of collectors to employ over 70 collectors by 2010.  The companies operated out of at least three call centers located in Amherst, New York, Chandler or Tempe, Arizona, and Charlotte, North Carolina.  BAM entered a three-year lease for a 3610 square foot office space in Amherst in January 2010, where it operated under nonparty Collins's supervision.  BAM operated out of office space at a strip mall at 8420 Bellhaven Boulevard in Charlotte, supervised by Defendant Lockwood.

45.     In order to forestall the growing number of consumer complaints, lawsuits, and government investigations that their systematic violations of consumer rights and deceptions of consumers were causing notwithstanding their largely successful efforts to achieve anonymity, Defendants began to vary the business name used by their collection agents, going so far as to register alternative trade names in the State of Arizona so that they would be able to process consumer payments under names other than Bayside, such as Allstate or Titan; and also founding in May 2009 a separate company in Arizona called National Check Services, LLC, with Defendants Bure and Lockwood and nonparty Collins as partners.

46.     In mid-2009, nonparty Collins founded a consulting firm called CJC Consulting, LLC.  Nonparty Collins thereafter dissociated himself from the BAM Group companies and instead developed a network of debt collection companies in the Buffalo area to which he provided, in return for a share of the businesses' profit stream, managerial services

through the consultancy, operating according to the business model developed at the BAM Group.

47.     By mid-2009, Defendants Lockwood and Bure determined similarly to generalize and export the business model developed at the BAM Group companies to other companies operating in the vicinities of Chandler, Arizona and Charlotte, North Carolina, which would take the place of the BAM Group companies in those areas.  Thus Defendants founded an Enterprise consisting of numerous debt collection companies operating in those areas and their shared management.  The purpose of the Enterprise was to evade liability to consumers and government investigators by creating the appearance of dozens of separate companies engaged in the collection of payday loans, which constituted "unlawful debt" under the RICO Act, by means of the deceptive practices pioneered at the BAM Group, when in reality the separate companies were all overseen on a day to day basis by Defendants Lockwood and/or Bure, who had a substantial financial interest in them, together with a small handful of their lieutenants.

48.     So that his name could be disassociated from companies he founded and oversaw, Defendant Lockwood founded the consultancy Defendant CLL3.  Through this company, Defendant Lockwood recruited subordinate managers from among existing supervisory level employees and social networks.  These subordinates would contribute capital to found new collection agencies, purchase payday loan portfolios, obtain office space and infrastructure, and hire initial staff.  Defendant Lockwood then provided day-to-day management and guidance to each new collection agency and received a significant share of the profits generated by the business.

49.     Defendant Lockwood thus duplicated the business model and practices developed at the BAM Group at numerous additional collection agencies in the Charlotte and nearby Fort Mill, South Carolina areas.

50.     In June 2010, Defendant Bure founded his consultancy, Defendant Open Collect, which provides payment processing software and services to debt collectors including the Debt Collector Defendants.  The benefit of Defendant Open Collect's service is that it enables the debt collector to process payments without revealing its location, as the consumer's bank statements reveal only the Chandler, Arizona location of Defendant Open Collect, thus preventing consumers from identifying the North or South Carolina company that took their money.

51.     In addition to generating numerous companies that he oversaw, Defendant Lockwood continued also to found further collection agencies formally owned by him.  Between 2010 and 2012, Defendants Bure and Lockwood jointly owned and operated a number of companies that maintained call centers in the Phoenix, Charlotte, and Fort Mill areas, including nonparty United Check Recovery (a partnership of those defendants with nonparty Angel Lopez, operating in the Fort Mill, South Carolina area); nonparty Nationwide Recovery Group (a partnership of those defendants with Defendant Bure's brother Todd Bure, operating out of the Chandler, Arizona area), nonparty Allstate Processing Group d/b/a Liberty Financial Asset Management (a partnership of those defendants operating in the Phoenix and Charlotte areas); and nonparty American Recovery Group (a partnership of those defendants that obtained business licenses in numerous states and operated out of the Phoenix and Charlotte areas).  The Allstate/Liberty and American Recovery companies employed dozens of collectors, operating out of a 10,000 square foot office space in the Agave Corporate Center in Tempe, Arizona,

supervised by Defendant Bure and his brother nonparty Todd Bure; and a 13,000 square foot

office space in Quorum Business Park, 7500 E. Independence Boulevard, Suite 101, Charlotte,

North Carolina, supervised by Defendant Lockwood.  United Check employed additional

collectors, operating out of a 2600 square foot office space at 2078 Carolina Place, Fort Mill,

South Carolina, supervised by Defendant Lockwood and nonparty Angel Lopez.

      52.     These companies routinely phoned consumers and refused to give their

name or location, stating only that the company was called "American" or "American

Litigation," or "Allstate" or "Allstate Litigation."

      53.     In May 2012, Defendant Lockwood founded Defendant Amway, which

operated out of a call center at 200 Regency Executive Park Drive, Suite 240, Charlotte, North

Carolina.  Through Amway, Defendant Lockwood purchased and collected portfolios of payday

loans, using collectors that he supervised and applying the methods pioneered at the BAM

Group.  Shortly after Defendant Amway commenced operations, the remaining operations of

nonparties Allstate/Liberty and American Recovery were moved into office space in the same

building, as Defendant Capital took over the 13,000 square foot call center in Quorum Business

Park previously occupied by those companies.

      54.     In October 2012, Defendant Lockwood formed Defendant United CR as a

Delaware corporation, which registered to do business in North Carolina in November 2012.

Defendant Lockwood is sole member and owner of Defendant United CR.  Defendants Elam and

McBride have served as additional day to day managers.

      55.     From its inception Defendant United CR has occupied office space at 200

Regency Executive Park Drive, Suite 200, Charlotte, North Carolina.  Since December 2012 the

space has been shared with additional companies including since August 2013 or earlier with Defendants ACS and Creditors.

56.     From its inception to the present, Defendant United CR has employed dozens of collectors, and placed hundreds of thousands of phone calls to tens of thousands of consumers throughout the United States, including, on information and belief, thousands of calls placed to hundreds of New York resident consumers.  These calls all concerned efforts to collect payday loans.

57.     From its inception to the present, Defendant United CR has collected millions of dollars from consumers throughout the United States, including at least hundreds of thousands of dollars collected from New York consumers in connection with alleged payday loans.

58.     Among the "spin-off" companies with which Defendants Lockwood and Bure have been involved was Defendant Capital, which Defendants Lockwood, Bure, and Cellent founded in July 2010.

59.     Defendant Cellent served ostensibly as sole member/manager of Defendant Capital according to its corporation filings.  However, Defendant Lockwood, either directly or through his consulting firms Defendants Amway and CLL3, actually controlled a large financial stake in the company and managed it on a day to day basis; and Defendant Bure actually helped found the company and provided ongoing services including payment processing and receiving mail.

60.     Defendant Capital provided in its July 2010 registration statement a current address that was a mailbox in the same business center in Chandler, Arizona used by Defendant Bure to receive mail for the BAM Group companies and numerous other companies

that he owned either with Defendant Lockwood or others.  In a July 2011 assumed name filing in

Arizona, Defendant Capital provided as its mailing address the mailbox used by Defendant Bure

in that business center to receive mail for the companies managed by him.

61.     By processing payments through Defendant Bure's consulting firm

Defendant Open Collect, Defendant Capital ensured that consumers' bank statements would

identify the company as "Capital Solutions" with a Chandler, Arizona location, thus preventing

consumers from identifying the company as one actually headquartered in Charlotte.

62.     To further prevent identification, Defendant Capital filed an assumed

name registration in Arizona in October 2011 as National Financial Services Group, and

thereafter would identify itself to consumers on the phone and through their bank statements as

"National" or "National Litigation" with a Chandler, Arizona location.

63.     Defendant McBride served from at least 2012 as Human Resources

Manager of Defendant Capital.  Defendant McBride also established Defendant Capital's

website, and a nonprofit corporation that Defendant McBride incorporated, nonparty Global

Freedom Inc., owned Defendant Capital's website address registration.

64.     Defendant Capital operated initially out of a 14,857 square foot call center

in the Harris Ridge flex space offices at 6125 Lakeview Road, Suite 100, Charlotte, North

Carolina.  In mid- to late-2012, Defendant Capital moved into the 13,000 square foot call center

in Quorum Business Park previously occupied by nonparties Allstate/Liberty and American

Recovery (companies owned and operated by Defendants Bure and Lockwood), taking over

some of the latter's operations and employees.

65.     Between late 2010 and mid-2013, Defendant Capital employed dozens of

collectors, and placed hundreds of thousands of phone calls to tens of thousands of consumers

throughout the United States, including, on information and belief, thousands of calls placed to hundreds of New York resident consumers. These calls all concerned efforts to collect payday loans.

66.    Between late 2010 and mid-2013, Defendant Capital collected millions of dollars from consumers throughout the United States, including at least hundreds of thousands of dollars collected from New York consumers in connection with alleged payday loans.

67.    In communications with consumers, Defendant Capital routinely refused to identify its company's true name, location, or mailing address, often providing false information or refusing to identify the company as anything other than "Capital," "Capital Solutions," "National," "Capital Litigation," or "National Litigation." This refusal to identify itself was a matter of general policy or practice of Defendant Capital at the direct instigation of the company's management, Defendants Cellent, McBride, and Lockwood.

68.    In communications with consumers, Defendant Capital routinely stated to consumers that failure to make immediate payment over the phone would result in the consumer's rapid arrest for criminal charges or service with a civil summons. In reality, these statements were lies. The use of this deceptive, high-pressure tactic was a matter of general policy or practice of Defendant Capital at the direct instigation of the company's management, Defendants Cellent, McBride, and Lockwood.

69.    In anticipation that at some point it would no longer be possible to use Defendant Capital to continue to collect payday loans because of consumer complaints and government scrutiny, Defendants Cellent, McBride, and Lockwood formed potential successor companies in advance of actually using them.

70.    Thus, in January 2012, Defendants formed Defendant Landmark as an Ohio company, which registered to do business in North Carolina in March 2012.

71.    Defendant Cellent served ostensibly as sole member/manager of Defendant Landmark according to its corporation filings.  However, Defendant Lockwood, either directly or through his consulting firms Defendants Amway and CLL3, actually controlled a large financial stake in the company and managed it on a day to day basis; and Defendant Bure, in return for a financial return, provided ongoing services to the company including payment processing.  Defendant McBride served from at least 2012 as Human Resources Manager of Defendant Landmark.  Defendant McBride also established Defendant Landmark's website, and a nonprofit corporation that Defendant McBride incorporated, nonparty Global Freedom Inc., owned Defendant Landmark's website address registration.

72.    Beginning in mid-2012, Defendant Landmark began operating out of the 14,857 square foot call center in the Harris Ridge flex space offices at 6125 Lakeview Road, Suite 100, Charlotte, North Carolina, shared with Defendant Capital.  In mid- to late-2012, Defendant Landmark moved with Defendant Capital into the 13,000 square foot call center in Quorum Business Park previously occupied by nonparties Allstate/Liberty and American Recovery (companies owned and operated by Defendants Bure and Lockwood), taking over some of the latter's operations and employees

73.    From mid-2012 to the present, Defendant Landmark has employed dozens of collectors, and placed hundreds of thousands of phone calls to tens of thousands of consumers throughout the United States, including, on information and belief, thousands of calls placed to hundreds of New York resident consumers.  These calls all concerned efforts to collect payday loans.

- 20 -

74.    Between mid-2012 and the present, Defendant Landmark has collected millions of dollars from consumers throughout the United States, including at least hundreds of thousands of dollars collected from New York consumers in connection with alleged payday loans.

75.    In communications with consumers, Defendant Landmark has routinely refused to identify its company's true name, location, or mailing address, often providing false information or refusing to identify the company as anything other than "Landmark," "Landmark Legal," "National," "National Litigation," or "United." This refusal to identify itself was a matter of general policy or practice of Defendant Landmark at the direct instigation of the company's management, Defendants Cellent, McBride, and Lockwood.

76.    In communications with consumers, Defendant Landmark has routinely stated to consumers that failure to make immediate payment over the phone would result in the consumer's rapid arrest for criminal charges or service with a civil summons. In reality, these statements were all lies. The use of this deceptive, high-pressure tactic was a matter of general policy or practice of Defendant Landmark at the direct instigation of the company's management, Defendants Cellent, McBride, and Lockwood.

77.    Defendants Cellent, McBride, and Lockwood have continued to create further companies as potential successors or alter egos of Defendants Capital and Landmark, in anticipation of needing to use a new vehicle to further their scheme. Defendants formed Universal Processing Solutions of Check Recovery, LLC as a South Carolina corporation in September 2012 and registered it to do business in North Carolina in November 2012. Nonparty John Joseph III serves ostensibly as sole member/manager of Universal according to its corporation filings. However, Defendants Cellent and Lockwood have managed the company

out of the Landmark offices in Quorum Business Park, as an alter ego of Defendant Landmark. Beginning in late 2012, employees of Capital and Landmark have placed phone calls to consumers in which they purported to call on behalf of "Universal" or "Universal Litigation," and then processed consumer payments which appeared on consumers' bank statements as payments to "Universal."

78. Defendants Cellent, McBride, and Lockwood also formed a company called ACH Recovery Solutions, LLC, a Delaware corporation in August 2012, registered to do business in North Carolina in November 2012. Defendant Cellent serves ostensibly as sole member/manager of Defendant ACH according to its corporation filings, but in actuality the company functions as an alter ego of Defendant Landmark, using the same address in Quorum Business Park occupied by Defendant Landmark as its mailing and office address.

79. Also among the "spin-off" companies with which Defendants Lockwood and Bure were involved was nonparty US Capital Management, LLC, which Defendants Lockwood and Elam founded in March 2011 as a Pennsylvania company and registered to do business in North Carolina in August 2011. Defendant Elam served ostensibly as sole member/manager of nonparty USC according to its corporation filings. However, Defendant Lockwood, either directly or through his consulting firms Defendants Amway and CLL3, actually controlled a large financial stake in the company and managed it on a day to day basis; and Defendant Bure, in return for a financial return, provided ongoing services to the company including payment processing.

80. By processing payments through Defendant Bure's consulting firm Defendant Open Collect, nonparty USC ensured that consumers' bank statements would identify

the company as "USC" with a Chandler, Arizona location, thus preventing consumers from identifying the company as one actually headquartered in Charlotte.

81.    Nonparty USC operated initially out of a 15,935 square foot call center in the Mallard Creek Center at 8420 Cliff Cameron Drive, Suite 200, Charlotte, North Carolina, at a rental cost of over $23,000 a month.  From approximately mid-2012 USC was succeeded by Defendant ACS and ceased to have operations of its own.

82.    In anticipation it would not forever be possible to use nonparty USC to continue to collect payday loans because of consumer complaints and government scrutiny, Defendants Elam and Lockwood formed potential successor companies in advance of actually using them.

83.    Thus, in May 2012, Defendants formed Defendant ACS as an Wyoming company, which registered to do business in North Carolina in July 2012, and subsequently registered to do business in a number of other states, including in the State of New York since August 2012.

84.    Defendant Elam served ostensibly as sole member/manager of Defendant Landmark according to its corporation filings.  However, Defendant Lockwood, either directly or through his consulting firms Defendants Amway and CLL3, actually controls a large financial stake in the company and manages it on a day to day basis; and Defendant Bure, in return for a financial return, provides ongoing services to the company including payment processing. Defendant Elam in fact provided Defendant Lockwood's then-current residential address as the location of the company's registered office in its North Carolina corporation filings.

85.    Beginning in late 2012, Defendant ACS took over the functions of nonparty USC and began operating out of the 15,935 square foot call center in the Mallard Creek

Center at 8420 Cliff Cameron Drive, Suite 200, Charlotte, North Carolina, occupied by nonparty USC. In mid-2013, Defendant ACS moved into a call center located at 200 Regency Executive Park Drive, Suite 200, Charlotte, North Carolina. On information and belief, Defendant ACS has continued to use nonparty USC's name from time to time as an alter ego.

86.     From late 2012 to the present, Defendant ACS has employed dozens of collectors, and placed hundreds of thousands of phone calls to tens of thousands of consumers throughout the United States, including, on information and belief, thousands of calls placed to hundreds of New York resident consumers. These calls all concerned efforts to collect payday loans.

87.     Between late 2012 and the present, Defendant ACS has collected millions of dollars from consumers throughout the United States, including at least hundreds of thousands of dollars collected from New York consumers in connection with alleged payday loans.

88.     In communications with consumers, Defendant ACS has routinely refused to identify its company's true name, location, or mailing address, often providing false information or refusing to identify the company as anything other than "ACS" or "ACS Group." This refusal to identify itself was a matter of general policy or practice of Defendant ACS at the direct instigation of the company's management, Defendants Elam and Lockwood.

89.     In communications with consumers, Defendant ACS has routinely stated to consumers that failure to make immediate payment over the phone would result in the consumer's rapid arrest for criminal charges or service with a civil summons. In reality, these statements were all lies. The use of this deceptive, high-pressure tactic was a matter of general policy or practice of Defendant ACS at the direct instigation of the company's management, Defendants Elam and Lockwood.

90.     As a further alter ego for Defendant ACS, in July 2012, Defendants formed Defendant Creditors as a Delaware company, which never registered to do business in any other state.

91.     Defendant Elam served ostensibly as sole member/manager of Defendant Creditors.  However, in actuality Defendant Creditors has served as an alter ego of Defendant ACS, and as such Defendant Lockwood, either directly or through his consulting firms Defendants Amway and CLL3, actually controls a large financial stake in the company's operations and manages them on a day to day basis; and Defendant Bure, in return for a financial return, provides ongoing services to the company including payment processing.

92.     Between late 2012 and late 2013, or later, Defendant Creditors employed dozens of collectors who were formally on the payroll of Defendant ACS, and through those employees Defendant Creditors placed hundreds of thousands of phone calls to tens of thousands of consumers throughout the United States, including, on information and belief, thousands of calls placed to hundreds of New York resident consumers.  These calls all concerned efforts to collect payday loans.

93.     Between late 2012 and late 2013, or later, Defendant Creditors collected millions of dollars from consumers throughout the United States, including at least hundreds of thousands of dollars collected from New York consumers in connection with alleged payday loans.

94.     In communications with consumers, Defendant Creditors routinely refused to identify its company's true name, location, or mailing address, often providing false information or refusing to identify the company as anything other than "Creditors"  This refusal

to identify itself was a matter of general policy or practice of Defendant Creditors at the direct instigation of the company's management, Defendants Elam and Lockwood.

95.     In communications with consumers, Defendant Creditors has routinely stated to consumers that failure to make immediate payment over the phone would result in the consumer's rapid arrest for criminal charges or service with a civil summons. In reality, these statements were all lies. The use of this deceptive, high-pressure tactic was a matter of general policy or practice of Defendant Creditors at the direct instigation of the company's management, Defendants Elam and Lockwood.

96.     Defendant Lockwood has continued to form numerous additional debt collection companies to further the goals of the Enterprise and continue profiting from the BAM Group model of deceptive payday loan collection practices. In April 2011, Defendant Lockwood formed nonparty Progressive National Recovery, LLC, as a Pennsylvania company registered to do business in North Carolina in December 2012. Nonparty Progressive is formally owned solely by Defendant Lockwood's nephew Ryan McDonough, but is in actuality largely owned by Defendant Lockwood and managed on a day to day basis by Defendant Lockwood and nonparty McDonough. Nonparty Progressive operates out of the same offices at 200 Regency Executive Park Drive, Suite 200, Charlotte, North Carolina, occupied by Defendants United CR and ACS. Nonparty Progressive applies, at Defendant Lockwood's direction, the same collection and anonymity tactics applied by the Enterprise generally, routinely identifying itself to consumers solely as "Progressive" or "Progressive Law Office" and refusing to give its full name or location. Nonparty Progressive collects solely payday loans.

97.     In May 2011, Defendant Lockwood formed Providence Financial Group, LLC as a Georgia company registered to do business in North Carolina in May 2012. Nonparty

Providence is formally owned solely by Defendant Lockwood's sister Mary Bivin, but is in

actuality a 50/50 partnership between herself and Defendant Lockwood and managed on a day to

day basis by Defendant Lockwood and nonparty Bivin. Nonparty Providence operates out of an

office at 7512 Independence Boulevard, Charlotte, North Carolina, in the same office park as the

offices of Defendants Capital and Landmark; and has, and may still, also operate out of an

additional call center in Rock Hill, South Carolina. Nonparty Providence applies, at Defendant

Lockwood's direction, the same collection and anonymity tactics applied by the Enterprise

generally, routinely identifying itself to consumers solely as "Providence" and refusing to give its

full name or location. Nonparty Providence collects solely payday loans that it purchases.

98.    Currently lying in wait to be used as necessary are corporate registrations

filed in South Carolina in 2013 for Silverlake Landmark Recovery Group, LLC, Capital Service

Management, LLC, CSM Paramount LLC, ESU Paramount Assets LLC, and Western Financial

Group, LLC—all providing as their contact information the same mailbox in a UPS Store in

Rock Hill, South Carolina used by nonparty Universal in its corporate registration, and used by

Defendant Lockwood to receive mail on behalf of the company Flyboard Lake Wylie, LLC,

owned jointly by Defendant Lockwood and nonparties Matthew Ashcroft and Jeff Pusateri.

99.    The nonparty debt collection companies founded by Defendants

Lockwood and/or Bure to collect payday loans out of call centers in the Charlotte and Fort Mill

and Rock Hill areas, including but not limited to United Check, Providence, Progressive,

Universal, and Silverlake Landmark, are referred to herein as the Nonparty Debt Collectors.

100.    Defendant McBride has created websites for all of the Debt Collector

Defendants and the bulk of the Nonparty Debt Collectors, and owns the web registrations of all

the Debt Collector Defendants and the bulk of the Nonparty Debt Collectors, through his nonprofit corporation, Global Freedom Inc.

101.    On information and belief, all of the Debt Collector Defendants and Nonparty Debt Collectors share one anothers' names and personnel in the course of collecting shared pools of payday loans placed for collection by Defendant Lockwood and companies he wholly or partially owns including Defendant Amway.  Individual debt collectors have been employed by the Enterprise since 2010 (and earlier with nonparty Bayside), moving from company to company as the Enterprise's needs arise.  Exemplary of the collective nature of the Enterprise and its common management structure, in addition to Defendant Lockwood's role in personally managing the entire Enterprise and all of its operations, is that a single Human Resources Manager has since 2010 been in charge of personnel at call centers in both Charlotte and Rock Hill, North Carolina locations housing employees of multiple companies.  This shared function was served initially by nonparty Lorraine Vasquez and is now served by Defendant McBride.

102.    On information and belief, the Individual Defendants chose their company names in part to achieve interoperability and thus evade detection and scrutiny, so that several Enterprise companies can be referred to by the same name, e.g., "National," or "United."

### Facts Specific to Named Plaintiff Shannon White

103.    In or around October 2012, Ms. White came upon a short-term financial emergency and sought a small loan to be used for personal, family, or household purposes.  After receiving a mail advertisement for a payday loan website, Ms. White went on the Internet to look for available payday loan options, and ultimately viewed a website where she submitted a loan application that was forwarded to a number of lenders.

104.    Between October and December 2012, Ms. White received several payday loans through deposits into her bank account, some of which she believed to be unauthorized by her.  In any event, each lender alleged that she became obligated to it to repay principal plus biweekly interest at an annual rate exceeding 500% and in some cases exceeding 1,000%.

105.    Among the payday loans deposited into Ms. White's account were loans from OPD Solutions LLC (apparently a Nevada limited liability company) on November 29, 2012, in the amount of $250, at an annual interest rate of 1,095%; from CP Investors LLC (apparently a Maryland limited liability company) on December 20, 2012, in the amount of $300, at approximately the same APR (though no APR disclosure was ever made to Ms. White concerning this loan); and from Vince Enterprises (apparently a company organized under the laws of Nevis, West Indies) on November 16, 2012, in the amount of $200, at an APR of 782.14%.  None of the lending companies possessed a New York licensed lender license or a bank charter, and thus none was exempt from New York's 16% usury cap.

106.    Each alleged payday loan received by Ms. White was an alleged obligation that arose out of a transaction in which money, services, or property, which was the subject of the transaction, was primarily for personal, family, and/or household purposes.  As such, each was a "debt" as that term is defined by 15 U.S.C. § 1692a(5).

107.    Because each alleged payday loan received by Ms. White was at an annual percentage rate far in excess of double New York's civil usury rate of 16%, by an entity that lacks a bank charter or licensed lender license from the New York banking department, each such loan was void and uncollectible as usurious and constituted "unlawful debt" under the RICO Act.

108.    Ms. White's bank account became overdrawn and she made altogether $180 in finance charge payments on the Vince Enterprises loan (also incurring $115.50 in overdraft and returned items charges); only a single finance charge payment of $75 on the OPD loan and no payments on the CP loan. Ms. White ultimately defaulted on all payday loans she received.

109.    Beginning in or around March 2013, Ms. White and her parents began to receive phone calls, voice mails, and messages concerning her payday loans from debt collectors that identified themselves as "Creditors," "Capital Solutions," and "United." These calls were placed by Defendants Creditors, Capital, and United CR.

110.    On March 25, 2013, Ms. White spoke on the phone with a woman identifying herself as Trisha St. James and a man identifying himself as Robert Green from Defendant United CR.

111.    During that conversation, Mr. Green stated that he was calling about the loan from Vince Enterprises. Ms. White correctly stated to Mr. Green that she believed the loan was unenforceable in New York because payday loans are illegal in New York and Mr. Green stated falsely that this was untrue and that she would be sued if she did not immediately pay $200. Ms. White agreed to and did make a debit card payment over the phone in the amount of $200.

112.    Later in March 2013, Ms. White spoke on the phone with a man who identified himself as Keith Brown from "Capital Solutions." Mr. Brown was an employee of Defendant Capital. Mr. Brown stated that he was calling about payday loans from CP Investors, and SecuredLoan LLC a/k/a OPD Solutions. Mr. Brown falsely stated that Ms. White would be brought up on wire fraud charges by the FDIC unless she agreed immediately to pay a total of

$940 to resolve the two loans.  Mr. Brown refused to provide the true name of his company,

saying only when requested that the company was called "Capital Litigation" and was also called

"National."  Mr. Brown refused to identify the location of the company, stating when asked that

it had offices in Arizona and Virginia.  At the end of the call Ms. White agreed to make three

payments, of $282 on April 1, 2013, and $329 on each of April 15 and April 26, 2013, and

provided her debit card information to another employee of Defendant Capital so that the

payments could be debited.

113.   After making the April 1 payment Ms. White informed her bank to stop

payment on the further two debits and then phoned Defendant Capital on April 8, 2013, at which

time she spoke with someone identifying himself as Mr. Johnson, who transferred her to

someone calling himself Alex St. Joy.

114.   Ms. White told Mr. St. Joy that she rescinded her debit card authorizations

because the loans were illegal and could not lawfully be collected from her.  Mr. St. Joy stated

falsely that the loans were legal and that Defendant Capital would proceed with a lawsuit against

Ms. White.  Ms. White demanded that Mr. St. Joy provide a mailing address for Defendant

Capital and he refused.

115.   Notwithstanding the withdrawal of debit authorization, Defendant Capital

proceeded to present the April 15 and 26 payments to Ms. White's bank for payment under her

debit card number, resulting in debits to her account that she disputed and had provisionally

reversed, unreversed, and then again reversed.  The payments appeared on Ms. White's bank

statement as being from "Cap Sltns Chandler AZ."

116.   Subsequent to April 8, 2013, Ms. White and her parents received further

phone calls, voice mails, and messages from debt collectors identifying themselves as

"Landmark," which calls were in fact from Defendant Landmark concerning Ms. White's payday loans. These calls are believed to have concerned the same payday loans from OPD Solutions and CP Investors, after the payments were provisionally reversed.

## Class Action Allegations

117.    Ms. White brings this action individually and on behalf of two Classes pursuant to Fed. R. Civ. P. 23(a) and (b)(3).

118.    The RICO Class consists of all individuals with New York addresses from whom any of the Debt Collector Defendants collected payments on a loan made at more than 32% interest made by an entity that did not possess a bank charter or a New York licensed lender license, where any payment was made on or after a date four years prior to the filing of this suit.

119.    The FDCPA Class consists of all individuals with New York addresses from whom any of the Debt Collector Defendants sought to collect a loan made at more than 16% interest by an entity that did not possess a bank charter or a New York licensed lender license, by any phone call or written communication made on or after a date one year prior to the filing of this suit.

120.    Excluded from the Classes are Defendants and their respective officers, members, partners, managers, directors, and employees, and the latters' immediate family members, and legal counsel for all parties to this action and members of their immediate families.

121.    *Numerosity.* Each class is so numerous that joinder of all members is impracticable. Based on the scale of the operations of Defendants, each class is believed to have hundreds of members.

122.   *Commonality.* There are questions of law or fact common to the Class members, which predominate over any questions that affect only individual Class members. The predominant common question with respect to the RICO Class is whether Defendants caused the Debt Collector Defendants to collect loans at more than 32% interest from New York residents, as part of an Enterprise whose purpose is to collect such loans. The predominant common question with respect to the FDCPA Class is whether the Debt Collector Defendants sought to collect loans at more than 16% interest and whether in doing so they engaged in deceptive conduct in violation of the FDCPA.

123.   *Adequacy.* Plaintiff will fairly and adequately represent the interests of the Class members. She has no interests antagonistic to those of the absent class members, is committed to vigorously litigating this matter, and has retained counsel experienced in class action and consumer and civil rights litigation. The Western New York Law Center provides direct legal services to thousands of Western New York residents with respect to foreclosure and administers a consumer debt law clinic that provides advice and assistance to hundreds of Western New Yorkers annually with respect to consumer debt. The Law Center maintains an active affirmative litigation practice in the areas of consumer debt collection and finance and civil rights. The Law Center has also served as class counsel in numerous class actions in state and federal courts, including *Martin* v. *Werner*, 06-CV-00094E (W.D.N.Y.) (class action on behalf of Erie County residents whose public benefits applications were not timely processed); *Kari C. and April M.* v. *Muller*, 6:09-CV-06367 (W.D.N.Y.) (class action on behalf of Steuben County residents whose public benefits applications were not timely processed); *Riding* v. *City of Buffalo*, Erie County Index No. 2011-3957 (N.Y. Supreme Court) (class action on behalf of homeowners challenging City of Buffalo *in rem* foreclosure fee as excessive); and *McCoy* v.

*Restaino*, 1:13-cv-00711-RJA-HBS (W.D.N.Y.) (class action on behalf of Niagara County residents whose public benefits applications were not timely processed).

124.   ***Typicality.***  Plaintiff's claims are typical of the claims of the respective Class members.  All are based on the same factual and legal theories.

125.   ***Superiority.***  A class action is superior for the fair and efficient adjudication of this matter in that individual actions are not economically feasible and members of the Classes are likely unaware of their rights.  Class action treatment will enable a large number of similarly situated persons to prosecute their common claims in a single forum efficiently and without unnecessary duplication of effort and expense that individual actions would engender.  Furthermore, it is believed that many if not most members of the proposed Classes have incomes below the poverty level, and have limited access to or ability to obtain legal counsel in order to bring their own actions.  In addition, Defendants have acted and are acting on grounds generally applicable to the Classes, thereby making appropriate relief with respect to the Classes as a whole

*126.*   ***Predominance.***  Ever class member's claim arises out of Defendants' uniform practice of phoning New York consumers to collect usurious loans.  The factual issue of the existence of this uniform practice and the legal questions whether it violates the FDCPA and RICO Act predominate over individual issues of damages that may follow resolution of the common liability issues.

127.   ***Ascertainability.***  The class members are identifiable and may be ascertained by objective criteria, by identifying the consumers with New York addresses whose account information Defendants purchased and whom Defendants phoned.

128.    *Manageability.* There are no factors that should render difficult the management of this action as a class action.

## Causes of Action

### AS AND FOR A FIRST CAUSE OF ACTION
**(Violation of Fair Debt Collection Practices Act against Defendants Capital, United CR, Creditors, ACS, and Landmark, on behalf of Ms. White and the FDCPA Class)**

129.    Plaintiff repeats and realleges paragraphs 1 through 123 of her Complaint as though fully set forth in this paragraph.

130.    Defendants Capital, United CR, Creditors, ACS (using the name Creditors), and Landmark each sought to collect payday loans from New York consumers (including Ms. White) which loans were made at an annual percentage rate in excess of 16% by entities that were not exempt from New York usury laws, and were thus void and unenforceable as to both interest and principal.

131.    Each such collection effort was a felony in violation of the New York Penal Law.

132.    Each such collection communication misrepresented the legal status of the debt by impliedly representing that it was enforceable and could lawfully be collected, in violation of 15 U.S.C. § 1692e and 1692e(2).

133.    Each such collection communication was unfair and unconscionable and sought to collect amounts not authorized by law, in violation of 15 U.S.C. § 1692f and 1692f(1).

134.    As a result of Defendants' violations of the FDCPA, Plaintiff and the absent FDCPA Class members have suffered actual damages in that they have made payments to the Defendants.

## AS AND FOR A SECOND CAUSE OF ACTION
### (Violation of Racketeer Influenced and Corrupt Organizations Act against All Defendants, on behalf of Ms. White and the RICO Class)

135.    Plaintiff repeats and realleges paragraphs 1 through 129 of her Complaint as though fully set forth in this paragraph.

136.    Under 18 U.S.C. § 1962(c), it is "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through . . . collection of unlawful debt."

137.    Under 18 U.S.C. § 1962(d), it is unlawful for any person to conspire to violate 18 U.S.C. § 1962(a), (b), or (c).

138.    18 U.S.C. § 1961(6) defines "unlawful debt" to include a debt "which is unenforceable under State or Federal law in whole or in part as to principal or interest because of the laws relating to usury" and "which was incurred in connection with the business . . . of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate."

139.    As set forth above, at all relevant times, the maximum enforceable interest rate in New York has been 16%, and contracts purporting to charge more are void and unenforceable.  Moreover, New York treats lending at more than 25% interest as a felony.

140.    Payday loans generally are made at annual percentage interest rates in excess of 300%, and that was true of each payday loan Defendants sought to collect from Ms. White.  These loans thus constitute "unlawful debt" under 18 U.S.C. § 1961(6).

141.   Defendants are in the business of collecting payday loans, which have interest rates usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate.

142.   18 U.S.C. § 1961(4) defines "enterprise" as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."

143.   The Individual Defendants and Consulting Defendants have participated in the operation, management, and direction of unlawful debt collection activities carried out from a handful of call centers in Charlotte, North Carolina and Fort Mill and Rock Hill, South Carolina, under a variety of names but principally through the vehicles of the Debt Collector Defendants, and have received the bulk of the profits of that activity.

144.   All Defendants have entered into an Enterprise, consisting of a collection of associated in fact debt collection companies and their management, to collect payday loans unenforceable in New York and other States from the consumers resident in those States.  This Enterprise is engaged in or conducts activities that affect interstate commerce.

145.   In violation of 18 U.S.C. § 1962(c), all Defendants have been employed by or associated with the Enterprise and have conducted the affairs of the Enterprise through the collection of unlawful debts.

146.   In violation of 18 U.S.C. § 1962(d), Defendants have conspired with one another and with others including the Nonparty Debt Collectors to violate 18 U.S.C. § 1962(c).

147.   Ms. White and the absent RICO Class members have suffered actual damages on account of Defendants' conduct of the Enterprise through collection of unlawful debt, in that Ms. White and the absent Class members have made payments to Defendants.

## Jury Demand

148.    Plaintiff demands a trial by jury in this action.

## Prayer for Relief

WHEREFORE, Plaintiff Shannon White respectfully demands that the Court

enter judgment against Defendants for:

A.    As to her first cause of action, an order certifying the action as a class

action; an award of actual damages jointly and severally against Defendants Capital, United CR,

Creditors, ACS, and Landmark and for Plaintiff and the FDCPA Class, pursuant to 15 U.S.C.

§ 1692k(a)(1), in the amount of $482 for Ms. White and in the full amount collected by

Defendants Capital, United CR, Creditors, ACS, and Landmark from FDCPA Class Members,

against Defendants Capital, United CR, Creditors, ACS, and Landmark  and for the FDCPA

Class; five awards of statutory damages of $1,000 each against each of Defendants Capital,

United CR, Creditors, ACS, and Landmark and for Ms. White, pursuant to 15 U.S.C.

§ 1692k(a)(2)(B)(i); five awards of statutory damages in the amounts of the lesser of $500,000 or

1% of the net worth of each of Defendants Capital, United CR, Creditors, ACS, and Landmark,

against those Defendants respectively and in favor of the FDCPA Class, pursuant to 15 U.S.C. §

1692k(a)(2)(B)(ii); and an award of costs, disbursements, and reasonable attorneys' fees jointly

and severally against Defendants Capital, United CR, Creditors, ACS, and Landmark and for

Plaintiff, pursuant to 15 U.S.C. § 1692k(a)(3);

B.    As to her second cause of action, an order certifying the action as a class

action; an order enjoining Defendants from collecting, or operating any company that collects,

payday loans from New York residents; an award of three-fold actual damages jointly and

severally against all Defendants, and for the RICO Class, pursuant to 18 U.S.C. § 1964(c), in an

amount no less than triple the total amount of payments actually collected from RICO Class

members by Defendants; and an award of costs, disbursements, and reasonable attorneys' fees

jointly and severally against all Defendants and for Plaintiff, pursuant to 18 U.S.C. § 1964(c);

          C.      Pre-judgment and post-judgment interest on all of the above judgments;

and

          D.      Such other and further relief as this Court may deem just and proper.

Dated: Buffalo, New York
       March 2014

_____

Matthew A. Parham
Western New York Law Center
237 Main Street, Suite 1130
Buffalo, New York 14203
(716) 855-0203 x112
mparham@wnylc.com

*Attorney for Plaintiff Shannon White*

## VERIFICATION

STATE OF NEW YORK    )
                     ) ss:
COUNTY OF ERIE       )

SHANNON WHITE, being duly sworn, deposes and says:

1. I am the Plaintiff in this civil proceeding.

2. I have read the above-entitled Complaint prepared by my attorney and I believe that all of the facts contained in it are true, to the best of my knowledge, information and belief formed after reasonable inquiry.

3. I believe that this Complaint is well grounded in fact and warranted by existing law or by a good faith argument for the extension, modification, or reversal of existing law.

4. I believe that this Complaint is not interposed for any improper purpose, such as to harass any Defendant(s), cause unnecessary delay to any Defendant(s), or create a needless increase in the cost of litigation to any Defendant(s), named in the Complaint.

5. I have filed this Complaint in good faith and solely for the purposes set forth in it.

_Shannon E. White_
Shannon White

Sworn to before me this
13th day of March, 2014

_____
Notary Public

MATTHEW ALAN PARHAM
NOTARY PUBLIC-STATE OF NEW YORK
No. 02PA6224317
Qualified in Kings County
My Commission Expires June 28, 2014

- 40 -