UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

**SHANNON WHITE, an individual;**
**on behalf of herself and all others similarly situated,**

                Plaintiffs,

                                              14-CV-203A

      -v-

**CAPITAL RECOVERY SOLUTIONS, LLC, et al.,**

                Defendants.
_____

## REPORT, RECOMMENDATION AND ORDER

This case was referred to the undersigned by the Hon. Richard J. Arcara, in accordance with 28 U.S.C. § 636(b)(1), for all pretrial matters and to hear and report on dispositive motions. Dkt. #14.

## PRELIMINARY STATEMENT

On or about March 24, 2014, plaintiff, Shannon White (hereinafter, "plaintiff" or "White") commenced this putative class action on behalf of herself and all others similarly situated seeking injunctive relief and damages stemming from the defendants' alleged violation of the Fair Debt Collection Practices Act, Title 15, United States Code, Section 1692 *et seq*. ("FDCPA") and the Racketeer Influences and Corrupt Organizations Act, Title 18, United States Code, Section 1961 *et seq*. ("RICO"). Dkt. #1. Currently before the Court is defendants' motion to dismiss this action and

1

compel arbitration. Dkt. #13. For the following reasons, it is recommended that defendants' motion to dismiss and to compel arbitration be denied without prejudice.

## FACTS

In or about October 2012, plaintiff submitted a loan application on a website offering payday loans. Dkt. #1, ¶103. The completed application was thereafter forwarded to a number of lenders. *Id.* Between October and December 2012, plaintiff received several payday loans through deposits made directly into her bank account. Indeed, plaintiff alleges in her complaint that some of these loans she did not believe she authorized. *Id.* at ¶104. The complaint further alleges that each of the lenders maintain that she became obligated to repay the principal plus biweekly interest at an annual rate exceeding 500% and in some cases exceeding 1000%. *Id.*

It is alleged in the complaint that three payday loans were deposited into plaintiff's account as follows: on November 16, 2012, $200 was deposited from Vince Enterprises at an annual interest rate of 782.14%; on November 29, 2012, $250 was deposited from OPD Solutions LLC at an annual interest rate of 1,095%; and on December 20, 2012, $300 from CP Investors LLC (although no APR was disclosed, it is alleged that it was the same APR as OPD Solutions LLC, 1,095% APR). *Id.* at ¶105. The complaint further alleges that "none of the lending companies possessed a New York licensed lender license or a bank charter, and thus none was exempt from New York's 16% usury cap." *Id.*

Moreover, the complaint states that because each payday loan was an alleged obligation that arose out of a transaction in which money, services or property was primarily intended for personal, family and/or household purposes, each loan was a "debt" as that term is defined by the FDCPA.  *Id.* at ¶106.  In addition, "[b]ecause each alleged payday loan received by Ms. White was at an annual percentage rate far in excess of double New York's civil usury rate of 16%, by an entity that lacks a bank charter or licensed lender license from the New York banking department, each such loan was void and uncollectible as usurious and constituted "unlawful debt" under the RICO Act."  *Id.* at ¶107.  Plaintiff alleges that she made a few finance charge payments, her account became overdrawn and she incurred overdraft and returned item charges.  Ultimately, plaintiff alleges that she defaulted on all the payday loans she received.  *Id.* at ¶108.

Plaintiff alleges that beginning in or around March 2013, she and her parents began receiving phone calls, voice mails, and messages concerning her payday loans from debt collectors that identified themselves as "Creditors," "Capital Solutions," and "United."  *Id.* at ¶109.  In the succeeding seven paragraphs in her complaint, plaintiff details several conversations she had with different debt collectors and identifies several payments that were made.  *See* Dkt. #1, ¶¶110-116.

In the opening paragraph of her complaint, plaintiff describes defendants' conduct as follows and thereafter, refers to it as "the Enterprise,"

> [h]ere, the Defendants have participated for years in an
> unlawful Enterprise whose purpose is to purchase and

3

>collect portfolios of "payday loans" in which the asserted interest rate is far more than double the maximum legally enforceable rate in New York. The loans are therefore void and unenforceable and constitute "unlawful debt" as defined in the RICO Act.  The Enterprise attempts to collect this "unlawful debt" by placing phone calls to New York consumers.  Each such phone call is a felony under the New York Penal Law.  In addition, to protect itself against consumer complaints and law enforcement action, the Enterprise creates a series of shell companies that place collection calls and process the resulting payments for a brief time and then seemingly go out of business, transferring operation to ostensibly new companies operating with the same collectors from the same locations; all the while systematically extorting payments from consumers by deceptively claiming to be collecting legitimate debt, and indeed, deceptively representing to consumers that the consumer's failure to pay will result in his or her being imprisoned or sued.

Dkt. #1, ¶1.

Pursuant to Sections 3 and 4 of the Federal Arbitration Act, defendants seek the dismissal of this action and an order compelling plaintiff to pursue her claims against defendants in her individual capacity and through arbitration.  Dkt. #13.  In support of the instant motion, defendants attach certain "Exemplar Contracts"[1] relative to the payday loans plaintiff obtained from OPD Solutions, Vince Enterprises and CP Investors.  Dkt. #13-2, Exhibits B, C and D.  More specifically, defendants assert that Exhibit B is an Exemplar Contract from OPD Solutions purportedly containing the standard terms and conditions uniformly used at the time plaintiff signed the written agreement with OPD Solutions. With respect to Vince Enterprises and CP Investors,

---

[1] Defendants have been unable to provide the actual loan documents signed by plaintiff and instead, rely on what they characterize as "Exemplar Contracts" claiming they contain the standard terms and conditions uniformly used at the time plaintiff entered into agreements with defendants.

defendants claim that the original agreements could not be obtained, but that the Exemplar Contracts contained the same standard terms and conditions uniformly used at the time plaintiff signed the agreements. In reliance on these Exemplar Contracts, defendants claim that plaintiff agreed to arbitrate any dispute, including her FDCPA and RICO claims alleged in her complaint. According to defendants, in relevant part, the agreements state:

> For purposes of this Waiver of Jury Trial and Arbitration Provision the words "dispute" and "disputes" are given the broadest possible meaning and include, without limitation (a) all claims, disputes, or controversies arising from or relating directly or indirectly to the signing of this Arbitration Provision, the validity and scope of this Arbitration Provision and any claim or attempt to set aside this Arbitration Provision . . . (g) all claims asserted by you individually against us and/or any of our employees, agents, directors, officers, shareholders, governors, managers, members, parent company or affiliated entities (hereinafter collectively referred to as "related third parties"), including claims for money damages and/or equitable or injunctive relief; (h) all claims asserted on your behalf by another person; (i) all claims asserted by you as a private attorney general, as a representative and member of a class of persons, or in any other representative capacity, against us, and/or related third parties . . .

Dkt. #13-1, p.5 and Dkt. #13-5, p.4. Moreover, the defendants rely upon the following provision in the Exemplar Contracts, "7. This Arbitration Provision is binding upon and benefits you, your respective heirs, successors and assigns. This Arbitration Provision is binding upon and benefits us, our successors and assigns and related third parties." Dkt. #13-5, p.5. Relying on this provision, defendants argue that they are entitled to arbitration "as assignees or related entities as servicers of the assignees. . . . Defendants purchased the subject debt and therefore is an assignee of the subject debt from the original creditor. Defendants retained the Defendants as servicers of the debt."

Dkt. #13-1, p.7.  In further support of this assertion, defendants submit the affidavit of defendant Charles Lockwood III, wherein he states:

> I was personally involved with the purchase of the unpaid loans on which plaintiff was obligated and which are referred to in Plaintiff's Complaint. . . . Upon information and belief, the Lenders are direct lenders who receive referrals from on-line marketers.  Upon information and belief, Ms. White applied for and received multiple loans from various on-line marketers.  Defendants in this suit received assignment of rights to collect on the loans to Ms. White, giving such defendants the same rights and privileges as the lenders.  I have personal knowledge that Defendants in this suit, were servicing the loans from the lenders on behalf of the current creditor, and would also have the right of agents and assignees.

Dkt. #13-3, ¶¶3, 11-13.  Defendant Lockwood's affidavit is flawed in that it fails to disclose his relationship to the other defendants, the terms of the purported assignments and whether defendants are acting as assignees, agents, servicers or related third parties.  Moreover, nothing in defendants' motion or supporting papers sets forth the nature of the relationship between the original signatory and the defendants.

## DISCUSSION AND ANALYSIS

For purposes of considering the instant motion and preparing this Report, Recommendation and Order, the Court considers all allegations of the complaint to be true.  *Graham v. BMO Harris Bank, N.A.*, No. 3:13cv1460(WWE), 2014 WL 4090578, *1 (D. Conn. July 16, 2014); *Moss v. BMO Harris Bank, N.A.*, 24 F.Supp.3d 281 (E.D.N.Y. June 9, 2014) ("when a court considers the motion to compel before discovery has taken place, and in the context of a motion to dismiss, it treats the allegations in plaintiffs' complaint as true"); *Guyden v. Aetna, Inc.*, 544 F.3d 376, 379, n.1 (2d Cir.

6

2008).  "In a typical motion to compel arbitration, the Court would apply a standard similar to that of a summary judgment motion, *DuBois v. Marcy's East Inc.*, 338 F.Spp'x 32, 33 (2d Cir. 2009), and some discovery may be allowable or necessary." *Lismore v. Société Générale Energy Corp.*, No. 11 Civ. 6705(AJN), 2012 WL 3577833, at *1 (S.D.N.Y. Aug, 17, 2012).  "Because a motion to compel arbitration is treated as an assertion that the court lacks subject-matter jurisdiction, the court may consider exhibits and affidavits related to the issue of arbitration agreements."

      Where, as here, a defendant claims to be entitled to enforce an arbitration clause as an assignee of the original contracting party, the defendant must submit evidence sufficient to demonstrate that the party (signatory) has actually assigned its contractual rights. For the reasons set forth below, the defendants have failed to satisfy this Court as to their relationship to the original signatories.  The Second Circuit has long stated, "it is difficult to overstate the strong federal policy in favor of arbitration, and it is a policy we have often and emphatically applied."  *Arciniaga v. General Motors Corp.*, 460 F.3d 231, 234 (2d Cir. 2006); *Ross v. American Express Company*, 547 F.3d 137, 142 (2d Cir. 2008); *Moss v. BMO Harris Bank, N.A.*, 24 F.Supp.3d 281, 285 (E.D.N.Y. 2014).  However, arbitration "is a matter of consent, not coercion."  *Volt Info. Scis. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468 (1989).  Thus, "[w]hile the FAA expresses a strong federal policy in favor of arbitration, the purpose of Congress in enacting the FAA was to make arbitration agreements as enforceable as other contracts, *but not more so.*"  *JLM Indus., Inc. v. Stolt-Nielsen SA*, 387 F.3d 163, 171 (2d Cir. 2004).

Where, as here, a non-signatory to an arbitration agreement seeks to compel arbitration, the Second Circuit has recognized, under principles of estoppel, that "a nonsignatory to an arbitration agreement may compel a signatory to that agreement to arbitrate a dispute where a careful review of the relationship among the parties, the contracts they signed . . . , and the issues that had arisen among them discloses that the issues the nonsignatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed." *Moss*, 24 F.Supp.3d 281, 286 (E.D.N.Y. 2014), *quoting Ross*, 547 F.3d at 144.

> The Second Circuit has been careful to note that its estoppel doctrine does not mean that "whenever a relationship of any kind may be found among the parties to a dispute and their dispute deals with the subject matter of an arbitration contract made by one of them, that party will be estopped from refusing to arbitrate." *Sokol Holdings, Inc. v. BMB Munai, Inc.*, 542 F.3d 354, 359 (2d Cir. 2008). In *Sokol* and in *Ross*, the Second Circuit rejected estoppel claims by non-signatories seeking to compel arbitration because the non-signatory was simply too remote from the contract; in other words, when the signatory consented to arbitrate with one party, it could not have foreseen the involvement of the nonsignatory, and therefore could not be said to have consented to arbitrate with the nonsignatory. See *Sokol*, 543 F.3d at 362 (rejecting claim of estoppel where nonsignatory's only relationship to contract was as a third-party wrongdoer); *Ross*, 547 F.3d at 148 ("[P]laintiffs have it precisely correct when they assert that there [was] no reason for someone signing up for a Chase Visa card, for example, to believe that he (or she) was entering into any kind of relationship with [Amex]."

*Moss*, 24 F.Supp.3d 281, 287. The District Court in Moss continued,

> On the other hand, and in accordance with the strong federal policy in favor of arbitration, many cases in this circuit have accepted claims of estoppel and allowed non-signatories to compel arbitration. See, e.g., Ross, 547 F.3d at 144-45 (collecting cases); In re A2P SMS Antitrust Litig., 972 S.Supp.2d 465, 479 (S.D.N.Y. 2013)(compelling arbitration

8

>                    where  nonsignatories were explicitly and implicitly
>                    mentioned in contract); Choctaw Generation Ltd. P'ship v.
>                    Am. Home Assur. Co., 271 F.3d 403, 406-08 (2d Cir. 2001)
>                    (compelling arbitration where non-signatory's dispute with
>                    signatory to separate contract was "linked textually" to the
>                    separate contract containing an arbitration provision.)

*Moss*, 24 F.Supp.3d at 287.

Since the Second Circuit's decision in *Ross*, district courts within the Second Circuit have formulated "a two-part intertwined-ness test, under which they examine whether: (1) the signatory's claims arise under the subject matter of the underlying agreement, and (2) whether there is a close relationship between the signatory and the non-signatory party."  *A2P*, 972 F.Supp.2d at 476; *see also, Lismore v. Société Générale Energy Corp.*, No. 11 Civ. 6705 (AJN), 2012 WL 3577833, at *7 (S.D.N.Y. Aug. 17, 2012).  In his affidavit, defendant Lockwood offers no evidence, except for his speculation and conclusory statements that defendants received assignment of rights to collect the loans to Ms. White.  On this record, there are insufficient facts presented in support of defendants' motion for this Court to conclude that there was indeed a close relationship between the signatory and the non-signatory parties herein, OPD Solutions, Vince Enterprises and CP Investors, such that the defendants may compel arbitration and have the instant action dismissed.

## **CONCLUSION**

For the foregoing reasons, this Court recommends that defendants' motion to dismiss and to compel arbitration be denied without prejudice.

Therefore, it is hereby **ORDERED** pursuant to 28 U.S.C. § 636(b)(1) that:

This Report, Recommendation and Order be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report, Recommendation and Order must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report, Recommendation and Order in accordance with the above statute, Fed.R.Civ.P. 72(b)(2) and Local Rule 72.

The district judge will ordinarily refuse to consider *de novo*, arguments, case law and/or evidentiary material which could have been, but were not presented to the magistrate judge in the first instance. *See, e.g., Paterson-Leitch Co., Inc. v. Massachusetts Municipal Wholesale Electric Co.*, 840 F.2d 985 (1st Cir. 1988). **Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Judge's Order.** *Thomas v. Arn*, 474 U.S. 140 (1985); *Wesolek, et al. v. Canadair Ltd., et al.*, 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 72 of the Local Rules for the Western District of New York, "written objections . . . shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection, and shall be supported by legal authority." **Failure to comply with the provisions of Local Rule 72 may result in the District Judge's refusal to consider the objection.**

In accordance with the requirements set forth in Local Rule 72, "[a]ny party filing objections to a Magistrate Judge's order or recommended disposition must include with the objections to the District Judge a written statement either certifying that the objections do not raise new legal/factual arguments, or identifying the new arguments and explaining why they were not raised to the Magistrate Judge." **Failure to comply with the provisions of Local Rule 72 may result in the District Judge's refusal to consider the objection.**

SO ORDERED.

DATED:   Buffalo, New York
         April 1, 2015

                                              *s/ H. Kenneth Schroeder, Jr.*
                                              **H. KENNETH SCHROEDER, JR.**
                                              **United States Magistrate Judge**